STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. AP-23-11

SIDNEY BLOCK, ELEANOR DANIELS,
EILEEN WOLPER, and ANIMAL
OUTLOOK,

      Petitioners,

     v.

AMANDA BEAL, Commissioner of Maine
Department of Agriculture, Conservation,
and Forestry,

    and

MAINE DEPARTMENT OF
AGRICULTURE, CONSERVATION, AND
FORESTRY, ANIMAL WELFARE
PROGRAM,

      Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER (M.R. CIV. P. 80C)**

Pursuant to M.R. Civ. P. 80C, Petitioners Sidney Block, Eleanor Daniels, Eileen Wolper, and Animal Outlook[1] (collectively, "Petitioners") have filed a Petition for Review of Agency Failure or Refusal to Act against Respondents Maine Department of Agriculture, Conservation, and Forestry and Commissioner Amanda Beal (collectively, "DACF"). Specifically, Petitioners allege that DACF has (1) failed to act in response to a citizen petition for rulemaking submitted by 150 registered voters and (2) has abdicated its responsibility to administer, implement, and enforce animal cruelty laws in aquaculture facilities. For the following reasons, the Rule 80C Petition is denied.

_____

[1] Animal Outlook formerly went by the name "Compassion Over Killing."

1

## BACKGROUND

The events giving rise to this appeal began in 2019 when DACF's Animal Welfare Program ("AWP") received an animal cruelty complaint[2] from Animal Outlook—a nonprofit organization dedicated to improving the welfare of animals. The complaint accused Cooke Aquaculture hatchery of committing acts of animal cruelty in the processing and harvesting of fish at the facility. R. 446-49.

DACF subsequently commenced an investigation into the complaint, though it acknowledged that to date it "had no experience investigating land-based aquaculture or [s]almon," and Maine did not have best management practices ("BMPs") in place for this type of agriculture. R. 446-47. At the conclusion of the investigation, DACF determined that Cook Aquaculture had taken appropriate action to improve training and operations in the facility and closed the complaint. R. 449. DACF recommended "that another state agency that specializes in aquatic animals look into developing oversight in animal care at this type of [a]quaculture facility to ensure proper compliance with BMPs in the future." R. 449.

Unsatisfied with DACF's response, Animal Outlook submitted a Citizen Petition to Initiate Rulemaking pursuant to 5 M.R.S. § 8055, demanding that the agency:

(1) develop BMPs for animal husbandry in aquaculture facilities; and

(2) issue a policy statement confirming DACF's commitment to ensuring that fish kept in aquaculture facilities be properly cared for and outlining training and inspection protocols specific to aquaculture facilities.

R. 1. The rulemaking petition contained the signatures of over 150 registered Maine voters, including those of Petitioners Sidney Block, Eleanor Daniels, and Eileen Wolper.

---

[2] DACF is statutorily charged with "investigat[ing] complaints of cruelty to animals and enforc[ing] cruelty-to-animal laws." 7 M.R.S. § 3906-B(11); *see also* 7 M.R.S. § 3902.

2

By letter dated September 1, 2022, DACF denied the petition on grounds that it was "incomplete and defective." R. 444-45. DACF cited two deficiencies: (1) Petitioners did not provide proposed rule text and (2) the policies requested were not judicially enforceable and thus, inappropriate for rulemaking. *Id.*

On February 22, 2023, Petitioners filed a Petition for Review of Agency Failure or Refusal to Act pursuant to M.R. Civ. P. 80C and a Complaint for Declaratory Relief pursuant to 5 M.R.S. § 8058. Counts I-IV of the Rule 80C Petition challenge the agency's denial of the Citizen Petition to Initiate Rulemaking, and Count VI alleges that DACF has failed to fulfill its duty to enforce animal cruelty laws in aquaculture facilities. Count V—which sought declaratory relief based on the agency's failed to adopt rules required by law—was dismissed by prior order, as the Court concluded that DACF was not legally obligated to adopt the rules envisioned by Petitioners. Having previously disposed of the Complaint for Declaratory Relief, *see* M.R.S. § 8058, the Court now addresses what remains: Petitioners' Rule 80C claims.

## STANDARD OF REVIEW

Petitioners characterize their Rule 80C Petition as one seeking judicial review of DACF's failure or refusal to act. Under 5 M.R.S. § 11001(2), "[a]ny person aggrieved by the failure or refusal of an agency to act shall be entitled to judicial review thereof in the Superior Court." "The relief available in the Superior Court shall include an order requiring the agency to make a decision within a time certain." *Id.* The Law Court has construed the language in Section 11001(2) to mean that with respect to failure-to-act claims, the "only remedy potentially available [is] an order, in the nature of mandamus, requiring the [agency] to act by a date certain." *Doe v. Bd. of Osteopathic Licensure*, 2020 ME 134, ¶¶ 22, 24, 242 A.3d 182. Petitioners bear the burden of demonstrating that they are entitled to relief. *See Anderson v. Me. Pub. Emp. Ret. Sys.*, 2009 ME 134, ¶ 3, 985 A.2d 501.

3

## DISCUSSION

This Rule 80C appeal asks the Court to resolve two primary issues: (1) whether DACF erred by failing to initiate rulemaking and by denying the rulemaking petition and (2) whether DACF has abdicated its responsibility to administer, implement, and enforce animal cruelty laws in aquaculture facilities. These issues are addressed below.

### I. Failure to Initiate Rulemaking and Denial of Rulemaking Petition

Petitioners contend that DACF was obligated to initiate rulemaking because their petition was supported by the signatures of more than 150 Maine voters as required by 5 M.R.S. § 8055(3). *See id.* (stating that "[w]henever a petition to adopt or modify a rule is submitted by 150 or more registered voters of the State, the agency shall initiate appropriate rulemaking proceedings within 60 days after receipt of the petition"). Petitioners furthermore challenge DACF's justifications for denying the petition.

Before reaching these contentions, however, the Court must address DACF's threshold challenge to the timeliness of the Rule 80C Petition as it relates to Counts I-IV. According to DACF, Petitioners filed their Rule 80C Petition more than 4 months after they received notice of DACF's decision to deny the rulemaking petition—well outside the 30-day window set forth by 5 M.R.S. § 11002(3). Moreover, DACF rejects Petitioners' attempt to characterize their claim as a challenge to the "agency's failure or refusal to act," which claims are deemed timely if "filed within 6 months of the expiration of the time within which the action should reasonably have occurred." 5 M.R.S. § 11002(3). To accept Petitioners' reframing, DACF argues, would ignore the fundamental dispute set forth in the Rule 80C Petition for Review as well as the reality that the agency "acted" when it denied the rulemaking petition.

4

Thus, to resolve the timeliness issue, the primary question the Court must answer is whether DACF's conduct constituted an "act"—in which case, Petitioners would be subject to a 30-day filing deadline, rendering the Rule 80C Petition untimely—or a "failure or refusal to act"—in which case, Petitioners would be subject to a 6-month filing deadline and the Petition would be timely. *See* 5 M.R.S. § 11002(3). The Court concludes that the agency's conduct is more appropriately characterized as the latter.

The Law Court's decision in *Lingley v. Maine Workers' Comp. Bd.*, provides useful guidance. 2003 ME 32, 819 A.2d 327. That case arose before the Law Court after the Superior Court dismissed the appellants' Rule 80C petition as untimely, and on appeal, the *Lingley* Court considered whether the appellants were entitled to judicial review of their challenge to the Worker's Compensation Board's failure to adopt a proposed rule. *Id.* ¶¶1-2, 6-9. In doing so, the Law Court rejected the appellants' contention that review was available under the APA provision governing an agency's "failure or refusal to act." *Id.* ¶ 9. It determined that the Board, which voted against the rule's adoption, had engaged in an "act—not a refusal or failure to act." *Id.* While the Law Court acknowledged that "the result was the same as a refusal to promulgate the proposed rule," it reasoned that "a refusal to take a requested action is not identical to a refusal to act." *Id.* ¶ 9.

The *Lingley* Court illustrated the difference with an example: "When an applicant applies to an agency for a permit or other approval, and the agency refuses to grant the permit or approval, that refusal is an action." *Id.* ¶ 9 n.7. "If, however, the agency refused to take *any action* on the application, the agency has refused to act." *Id.* (emphasis added). It added that a "typical instance" of agency refusal or failure to act" is illustrated in *Eastern Maine Medical Center v. Maine Health Care Finance Commission*, in which the agency failed to issue a

5

decision in response to the appellant's application and thus, "did not act on the [] application" at all. *Id.* ¶ 9 n.7 (citing *Eastern Maine Medical Center*, 601 A.2d 99 (Me.1992)).

In this case, the Court concludes that DACF's conduct is more akin to the agency action in *Lingley* than the "typical instance" of agency failure or refusal to act in *Eastern Maine Medical Center. Id.* DACF declined to commence rulemaking and denied the citizen petition though the issuance of a written decision setting forth its grounds for refusing to take the action requested. *See* R. 444-45 (reasoning that the petition was "incomplete and defective" and "d[id] not provide for appropriate rulemaking"). Indeed, this is not a case where the agency refused to take "any action" on the rulemaking petition at all. *Lingley*, 2003 ME 32, ¶ 9 n.7 819 A.2d 327; *Cf. Eastern Maine Medical Center*, 601 A.2d at 100. Rather, DACF considered Petitioners' rulemaking petition and issued an affirmative decision denying it.

Under these circumstances, the Court concludes that DACF's denial of the petition and refusal to initiate rulemaking constituted an "act"—not a "failure or refusal to act." *Lingley*, 2003 ME 32, ¶ 9, 819 A.2d 327. Accordingly, Petitioners were subject to the 30-day filing deadline in Section 11002(3). *See* 5 M.R.S. § 11002(3).[3] Petitioners' claims relating to the rulemaking

---

[3] Even assuming, as Petitioners contend, that the 30-day deadline does not apply because a decision on a petition for rulemaking is not a "proceeding," Petitioners offer no persuasive contention as to why they would not be subject to the "catch-all" provision of Section 11002(3), which states that "[a]ny other person aggrieved shall have *40 days* from the date the decision was rendered to petition for review." 5 M.R.S. § 11002(3) (emphasis added). And in any event, the Court sees no reason to dwell on whether the 30-day or 40-day deadline applies, as Petitioners' Rule 80C Petition would not be timely under either timeframe. The Court furthermore rejects Petitioners' suggestion that neither time limit is implicated because DACF's decision denying the rulemaking petition is not adjudicatory in nature. Pet'rs' Reply Br. 3 n.5. To the extent Petitioners suggest that DACF's decision is more akin to rulemaking, the Court disagrees because "unlike adjudications, which are quasi-judicial determinations of individual rights, rulemaking is focused on policy matters of general applicability." *Forest Ecology Network v. Land Use Regulation Comm'n*, 2012 ME 36, ¶ 46 & n.11, 39 A.3d 74. Although the rulemaking petition sought adoption of a rule of general applicability, DACF's decision denying the petition

petition (Counts I-IV)—which were raised in a Rule 80C Petition filed months after DACF's issued its decision—are therefore untimely and must be dismissed for lack of jurisdiction. *See Mutty v. Dep't of Corr.*, 2017 ME 7, ¶ 8, 153 A.3d 775 ("The time limits set forth in the [APA] . . . are jurisdictional, meaning that unless the petition is timely filed, the court lacks jurisdiction. If jurisdiction is lacking, the court must dismiss the petition." (internal citations and quotation marks omitted)).

## II. Abdication of Duty to Enforce Animal Cruelty Laws in Aquaculture Facilities

Count VI of the Petition for Review asserts that DACF has failed to fulfill its duty to administer, implement, and enforce animal cruelty laws in aquaculture facilities and seeks an order requiring the agency to enforce the law accordingly. DACF contends that the Court should not reach this claim because Petitioners lack standing. Alternatively, DACF asserts that the record reveals it has complied with its statutory enforcement duties.

*A. Standing*

Petitioner Animal Outlook asserts that it has organizational standing to bring this claim, arguing that it has suffered an injury in its own right.[4] *See* Pet'rs' Reply Br. 6. Specifically, it maintains that DACF's inaction has frustrated its organizational mission and required Animal Outlook to divert its resources to counteract the harm caused by the agency's practices.

The right to appeal from an administrative action or inaction is governed by statute. *Nelson v. Bayroot, LLC*, 2008 ME 91, ¶ 9, 953 A.2d 378. "Whether a party has standing depends on the wording of the specific statute involved." *Id.* In this case, the governing statutory

---

was a quasi-judicial determination of Petitioners' rights under 5 M.R.S. § 8055(3) and thus, adjudicatory in nature.

[4] It does not appear that Animal Outlook is pursuing a theory of associational or representative standing, which is predicated on an injury felt by an organization's members.

provision is Section 11001(2) of the APA, which states: "*Any person*[5] *aggrieved* by the failure or refusal of an agency to act shall be entitled to judicial review thereof in the Superior Court." 5 M.R.S. § 11002(2) (emphasis added). "A person is aggrieved within the meaning of the APA if that person has suffered particularized injury—that is, if the agency action operated prejudicially and directly upon the party's property, pecuniary or personal rights." *Nelson*, 2008 ME 91, ¶ 10, 953 A.2d 378.

While the parties appear to agree that the Law Court has yet to explore the contours of organizational standing, it is "well-accepted" in federal courts "that organizations may have interests of their own, separate and apart from the interests of their members." *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44 n.7 (1st Cir. 2012). Accordingly, federal precedent has recognized that a non-profit organization may suffer a legally cognizable injury in its own right when government action/inaction impedes the organization's activities, requiring it to divert resources to counteract the alleged harm. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-20 (D.C. Cir. 2015).

For instance, in *Havens Realty*, the United States Supreme Court held that an organizational plaintiff had standing where the defendant's practices "perceptibly impaired [the plaintiff's] ability to provide [the services it was formed to provide]." *Id.*; *see also Miami Valley Fair Hous. Ctr., Inc. v. Connor Group*, 725 F.3d 571, 576 (6th Cir. 2013); *El Rescate Legal Services, Inc. v. Executive Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991). "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the

---

[5] The APA's definition of "[p]erson" includes an "association or public or private organization of any character." 5 M.R.S. § 8002(8).

organization's abstract social interests" and thus, suffices for standing. *Havens Realty*, 455 U.S. at 379; *People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*"). In other words, organizational standing may be satisfied upon a showing that an agency's "inaction injured [the organization's] interests and, consequently, [the organization] has expended resources to counteract those injuries." *PETA*, 797 F.3d at 1094.

Here, although this case presents a close call, the Court is satisfied that the alleged agency inaction has operated prejudicially and directly on Animal Outlook's organizational interests in a manner sufficient to establish standing. *Nelson*, 2008 ME 91, ¶ 10, 953 A.2d 378. Animal Outlook is a nonprofit organization whose mission is to "build a better tomorrow for all animals," including fish kept for aquaculture. Pet. & Compl. ¶ 22. A key way the organization accomplishes this goal is through investigating animal cruelty, reporting cruelty to law enforcement, and supporting state and federal agencies in the enforcement of animal cruelty laws. *Id.* The alleged failure or refusal to enforce animal cruelty laws in aquaculture facilities by DACF, which is charged with investigating complaints and "enforc[ing] cruelty-to-animal laws," 7 M.R.S. § 3906-B(11), has "perceptibly impaired" Animal Outlook's mission to improve the welfare of animals through it normal process of submitting animal cruelty complaints and aiding subsequent enforcement efforts. *Havens Realty*, 455 U.S. at 379 (1982); *PETA*, 797 F.3d at 1093-95; Pet. & Compl. ¶¶ 22, 162. The Court thus concludes that the alleged injury at issue— the denial of an adequate means by which to seek redress for cruelty to fish—constitutes a cognizable injury for standing purposes. *See PETA*, 797 F.3d at 1093-95.

Moreover, Animal Outlook has expended resources to counteract those injuries. *Havens Realty*, 455 U.S. at 379; *PETA*, 797 F.3d at 1093-95. Petitioners allege that as a result of DACF's alleged inaction, Animal Outlook has been forced to divert its resources away from supporting

9

animal cruelty prosecutions to: (1) demanding and reviewing public records; (2) educating the public about Maine's absence of animal welfare protections in aquaculture; and (3) attempting to cure the inaction through its rulemaking efforts, which has included the collection and verification of signatures necessary to support the Citizen Petition to Initiate Rulemaking. *See* Pet. & Compl. ¶¶ 22, 162. Under these circumstances, the Court concludes that Animal Outlook has suffered a sufficiently particularized injury and has demonstrated that it has been aggrieved by DACF's alleged failure or refusal to enforce animal cruelty laws in aquaculture facilities.

*B. DACF's Compliance with its Enforcement Obligations*

DACF does not appear to dispute that it has been charged with the duty to enforce animal cruelty laws in aquaculture facilities. *See* 7 M.R.S. §§ 3902, 3906-B(11) (the Commissioner of DACF "shall investigate complaints of cruelty to animals and enforce cruelty-to-animal laws"); *see also id.* § 3907(2) (defining "[a]nimal" to mean "every living, sentient creature not a human being"). It argues, however, that the record does not support Petitioners' claim that it has abdicated its duty to do so. The Court agrees.

The record reveals that when the agency received a complaint concerning animal cruelty in an aquaculture facility (Cooke Aquaculture), it undertook an extensive investigation in response. DACF's investigative efforts included observing video footage submitted by Animal Outlook; interviewing witnesses; reviewing best aquaculture practices promulgated by the Global Aquaculture Alliance; consulting officials from the Department of Inland Fisheries and Wildlife and the Department of Marine Resources; and visiting the facility on multiple occasions. R. 446-49. DACF also expressed its view that it was equipped to handle future investigations and complaints, noting that it "can deal with circumstances of animal cruelty in aquaculture facilities under its existing statutes and rules." R. 445. While Petitioners may

10

disagree with how the agency resolved the complaint against Cooke Aquaculture and possess different views regarding how best to enforce animal cruelty laws, the record does not support Petitioners' claim that DACF "'consciously and expressly adopted a general policy [of non-enforcement]'" of animal cruelty laws in the aquaculture context. Pet'rs' Br. 21-22 (quoting *United States v. Texas*, 599 U.S. 670, 682-83 (2023)).

Petitioners emphasize that in DACF's report addressing the Cooke Aquaculture complaint, the agency included a "recommendation that another state agency that specializes in aquatic animals look into developing oversight in animal care at this type of [a]quaculture facility to ensure proper compliance with BMPs in the future." R. 449. The Court, however, does not understand this statement as an expression of DACF's intent to absolve itself from its enforcement obligations, but rather, a policy recommendation in favor of a collaborative approach to ensuring that animals in aquaculture facilities are properly cared for. In sum, Petitioners fall short of demonstrating the pattern of nonenforcement they claim.

## CONCLUSION

**The entry is**: Petitioners' Rule 80C Petition for Review of Agency Failure or Refusal to Act is DENIED.

The clerk is directed to incorporate this order on the docket by reference pursuant to M.R. Civ. P. 79(a).

Date: July 15, 2024

Michaela Murphy
Justice, Maine Superior Court

7/17/24: Entered on the docket

11