MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2024 ME 30
Docket:      Ken-23-280
Argued:      February 6, 2024
Decided:     April 25, 2024

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

CHRIS CALNAN et al.

v.

SAM HURLEY et al.

LAWRENCE, J.

[¶1]  Chris Calnan, seventeen named individuals, and 100 John and Jane Does (collectively, Calnan) appeal from a judgment of the Superior Court (Kennebec County, *Murphy, J.*) dismissing Calnan's complaint for a declaratory judgment that Maine EMS lacked statutory authority to implement an immunization rule requiring emergency medical service (EMS) workers to be fully vaccinated against COVID-19 and influenza.  *See* 14 M.R.S. §§ 5953-54 (2024).  We affirm the judgment.[1]

---

[1]  Pursuant to the Maine Administrative Procedure Act (APA), Calnan also purported to seek damages, in the form of lost wages and lost benefits, caused by the implementation of the EMS immunization rule.  *See* 5 M.R.S. §§ 8002(4), 11001(1) (2024).  We need not address the unavailability of damages under the APA or Rule 80C given our ruling.  *See id.* §§ 8001-1108; M.R. Civ. P. 80C.

2

## I. BACKGROUND

[¶2] On August 12, 2021, the Department of Health and Human Services announced an emergency rule requiring that healthcare workers, including dental workers and EMS workers, be fully vaccinated against COVID-19 by October 1, 2021.[2] *See* 10-144 C.M.R. ch. 264, §§ 1-2 (effective Aug. 12, 2021). In November 2021, the Department promulgated a nonemergency rule. 10-144 C.M.R. ch. 264 (effective Nov. 10, 2021). The Department excluded dental workers and EMS workers from the November 2021 rule.[3] *Id.* §§ 1-2. Maine's Emergency Medical Services Board (EMS Board) promulgated an emergency immunization rule through 16-163 C.M.R. ch. 20, § 2 (effective Aug. 25, 2021) requiring EMS workers to be fully vaccinated against COVID-19; the rule expired on November 21, 2021. The EMS Board then promulgated a nonemergency immunization rule that became effective on August 7, 2022.[4] *See* 16-163 C.M.R. ch. 21 (effective August 7, 2022).

---

[2] *See* Off. of Governor Janet T. Mills, *Mills Administration Requires Health Care Workers To Be Fully Vaccinated Against Covid-19 By October 1*, State of Me. (Aug. 12, 2021), https://www.maine.gov/governor/mills/news/mills-administration-requires-health-care-workers-be-fully-vaccinated-against-covid-19-october [https://perma.cc/RPW5-9HE4].

[3] Covid-19 Response, *Covid-19 Vaccination in Maine*, State of Me., https://www.maine.gov/covid19/vaccines/public-faq/health-care-worker-vaccination (last updated Nov. 10, 2021) [https://perma.cc/3H7Q-RRMW].

[4] The EMS Board has since amended chapter 21. *See* 16-163 C.M.R. ch. 21 (effective Jan. 10, 2024). Chapter 21 now requires that Maine EMS workers be vaccinated against influenza (or otherwise wear

[¶3]  On December 13, 2022, Calnan filed a complaint for a declaratory judgment against Maine Emergency Medical Services and its director, Sam Hurley, (collectively, Maine EMS) in the Superior Court.  He attached multiple exhibits to the complaint, including the Department's immunization rule, *see* 10-144 C.M.R. ch. 264 (effective Nov. 10, 2021), the EMS Board's emergency rule, *see* 16-163 C.M.R. ch. 20 (effective Aug. 25, 2021), the EMS immunization rule, *see* 16-163 C.M.R. ch. 21 (effective August 7, 2022), and minutes from the EMS Board's meeting on the EMS immunization rule.

[¶4]  On January 27, 2023, Maine EMS filed a motion to dismiss, arguing that Calnan failed to name the proper defendants to the action because the EMS Board should have been designated as a defendant, *see* M.R. Civ. P. 12(b)(2); that the court does not have jurisdiction over Calnan's Rule 80C claim, *see* M.R. Civ. P. 12(b)(1); and that the court should dismiss the declaratory judgment claim because Maine EMS did not exceed its statutory authority, there was no procedural defect in the rulemaking process, and there is no viable substantive challenge to the EMS immunization rule, *see* M.R. Civ. P. 12(b)(6).

---

a mask), mumps, rubella, rubeola, pertussis, and varicella, but not COVID-19.  16-163 C.M.R. ch. 21, §§ 1(4), 2, 4(1) (effective Jan. 10, 2024).

Given our ruling in this case that the EMS Board has authority to issue immunization requirements, it does not matter which version of the rule we look at, and the new rule does not raise any mootness issues for this reason.

4

[¶5]  Calnan, on February 14, 2023, filed an opposing memorandum and a motion for summary judgment.  In his summary judgment motion, Calnan argued that Maine EMS exceeded its statutory authority in promulgating the EMS immunization rule and that Maine EMS did not follow the proper procedure in promulgating the rule.  On February 28, 2023, Maine EMS filed a memorandum in support of its motion to dismiss and in opposition to Calnan's motion for summary judgment.

[¶6]  On July 13, 2023, the court granted Maine EMS's motion to dismiss and dismissed Calnan's complaint with prejudice after concluding, as a matter of law, that Calnan's challenges to the EMS immunization rule fail.[5]  The court first determined that Calnan did not misname a defendant because Maine Emergency Medical Services and Hurley were appropriately named, and the court could "simply recaption the matter to reflect the Board as the proper defendant."[6]  The court then concluded that pursuant to 5 M.R.S. § 8058 (2024), which provides for judicial review of rulemaking through a declaratory

---

[5]  The court did not appear to rely on any exhibits attached to the complaint or motion to dismiss. Even if the court did, the matters possibly considered on the motion to dismiss were official public documents, which may be considered by the court on a motion to dismiss without the court having to convert the motion to one for summary judgment.  *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 10, 843 A.2d 43.

[6]  The court further noted that Calnan had appropriately named Maine EMS, a statutorily defined entity of which the EMS Board is a part, as a party in this matter.

judgment action, it had subject matter jurisdiction to consider Calnan's challenge to the EMS Board's rulemaking.[7] 5 M.R.S. § 8058(1). The court next determined that the EMS Board acted within its authority in implementing the EMS immunization rule and, therefore, Calnan did not allege a claim upon which relief could be granted. *See* M.R. Civ. P. 12(b)(6). The court dismissed as moot Calnan's motion for summary judgment and the remaining pending motions. Calnan timely appealed. M.R. App. P. 2B(c)(1); 14 M.R.S. § 1851 (2024).

## II. DISCUSSION

[¶7] In an appeal from an order granting a motion to dismiss, we review de novo the legal sufficiency of a complaint and "view the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Doe v. Bd. of Osteopathic Licensure*, 2020 ME 134, ¶ 6, 242 A.3d 182 (quotation marks omitted).

[¶8] Calnan argues that Maine EMS was without statutory authority to implement the EMS immunization rule and that the rule is misaligned with the Maine EMS Act's statement of purpose. He also contends that there was a

---

[7] Calnan does not appeal this conclusion.

procedural defect in the rulemaking process of the EMS immunization rule, because the EMS Board should have promulgated the rule as a "major substantive rule" as opposed to a "routine technical rule."  We address each of his arguments in turn.

## A.    Statutory Authority

[¶9]  "State agencies may exercise only that power which is conferred upon them by law."  *Molasses Pond Lake Ass'n v. Soil & Water Conservation Comm'n*, 534 A.2d 679, 681 (Me. 1987).  An agency's authority is determined by its enabling statute and is subject to the provisions of the APA.  *See id.*; *State v. Fin & Feather Club*, 316 A.2d 351, 355-56 (Me. 1974); *Me. Turnpike Auth. v. Brennan*, 342 A.2d 719, 723-25 (Me. 1975); *Ne. Occupational Exch., Inc. v. State*, 540 A.2d 1115, 1117 (Me. 1988).  Under an enabling statute, a public body or a state agency may employ powers that are expressly granted, powers that are "reasonably inferred from powers expressly granted," and powers that are "essential to give effect to powers expressly granted."  *Fin & Feather Club*, 316 A.2d at 355.  Title 5 M.R.S. § 8058(1) provides the standard by which we review a rule to determine if it exceeds an agency's rule-making authority.  We have explained that

> [i]f the rule exceeds the rule-making authority of the agency, it is invalid.  5 M.R.S. § 8058(1).  If a rule does not exceed the

rule-making authority, the court next reviews "any other procedural error" related to the promulgation of the rule. *Id.* . . . Finally, if the rule is procedurally correct and within the agency's rule-making authority, it is reviewed substantively "to determine whether the rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.*

*Conservation L. Found., Inc. v. Dep't of Env't Prot.*, 2003 ME 62, ¶ 21, 823 A.2d 551.

[¶10]    Whether Maine EMS exceeded its statutory authority in promulgating the EMS immunization rule is an issue of statutory interpretation. *See id*. ¶ 23.   We review de novo the interpretation of a statute.  *Bd. Of Osteopathic Licensure*, 2020 ME 134, ¶ 10, 242 A.3d 182.

[¶11] We use a two-part analysis in reviewing an agency's interpretation of a statute it administers. *Guilford Transp. Indus. v. Pub. Utilities Comm'n*, 2000 ME 31, ¶ 11, 746 A.2d 910.  If the statute is unambiguous, we give effect to the plain meaning of the statute. *Conservation L. Found., Inc.*, 2003 ME 62, ¶ 23, 823 A.2d 551.  If it is ambiguous, we determine whether the agency's interpretation was reasonable. *Id.*; *Guilford Transp. Indus.*, 2000 ME 31, ¶ 11, 746 A.2d 910. "[I]f the Legislature's intent is not expressed unambiguously and the interpretation of the statutory scheme involves issues that are within the scope of the agency's expertise, then the agency's interpretation must be given special deference." *Conservation L. Found., Inc.*, 2003 ME 62, ¶ 23, 823 A.2d 551;

8

*Molasses Pond Lake Ass'n*, 534 A.2d at 681. "A particular statute is not reviewed in isolation but in the context of the statutory and regulatory scheme." *Conservation L. Found., Inc.*, 2003 ME 62, ¶ 23, 823 A.2d 551.

[¶12]  The Maine Emergency Medical Services Act of 1982 (EMS Act) provides for the EMS system in Maine.  *See* 32 M.R.S. §§ 81-98 (2024).  Per the preamble in section 88, "the [EMS] Board, as established by [5 M.R.S. § 12004-A(15) (2024)], is responsible for the emergency medical services program."  The EMS Board's express powers include "conduct[ing] an emergency medical services program to fulfill the purposes, requirements and goals" of the EMS Act and "adopt[ing] the forms, rules, procedures, testing requirements, polices and records appropriate to carry out the purposes, requirements and goals" of the EMS Act.  32 M.R.S. § 84(1)(A).

> Rules adopted pursuant to [the EMS Act] must include, but are not limited to, the following:
>
> (1) The composition of regional councils and the process by which they come to be recognized;
>
> (2) The manner in which regional councils must report their activities and finances and the manner in which those activities must be carried out under this chapter;
>
> . . .

(4) The requirements for licensure for all vehicles, persons and services subject to this chapter, including training and testing of personnel; and

(5) Fees to be charged for licenses under this section.

*Id.* § 84(1)(D).[8]  Section 81-A sets out a statement of purpose declaring that the EMS Act is intended "to promote and provide for a comprehensive and effective [EMS] system to ensure optimum patient care."  The statement of purpose goes on to express the Legislature's intent "to designate that a central agency be responsible for the coordination and integration of all state activities concerning [EMS] services," including "the safe handling and transportation" of patients:

> It is the purpose of this chapter to promote and provide for a comprehensive and effective emergency medical services system to ensure optimum patient care.  The Legislature finds that emergency medical services provided by an ambulance service are essential services.  The Legislature finds that the provision of medical assistance in an emergency is a matter of vital concern affecting the health, safety and welfare of the public.
>
> It is the intent of the Legislature to designate that a central agency be responsible for the coordination and integration of all state activities concerning emergency medical services and the overall planning, evaluation, coordination, facilitation and regulation of emergency medical services systems.  Further, the Legislature finds that the provision of prompt, efficient and effective emergency medical dispatch and emergency medical care, a well-coordinated trauma care system, effective communication

---

[8] There is no item (3) in the statute.

between prehospital care providers and hospitals and the safe handling and transportation, and the treatment and nontransport under appropriate medical guidance, of the sick and injured are key elements of an emergency medical services system. This chapter is intended to promote the public health, safety and welfare by providing for the creation of a statewide emergency medical services system with standards for all providers of emergency medical services.

*Id.* § 81-A. The statute unambiguously delegates to the EMS Board rulemaking authority regarding qualifications of EMS personnel, and its statutory purpose clearly vests the EMS Board with the responsibility of creating standards and qualifications for such personnel.

[¶13] Calnan argues that unlike in the chapter relating to the Department of Health and Human Services, *see* 22 M.R.S. § 802 (2024), which gives the Department of Health and Human Services express authority to promulgate immunization rules for healthcare workers, Section 81-A does not specifically confer such authority on the EMS Board. Thus, he maintains, it is beyond the power of the EMS Board to address immunization in its rules. We disagree.

[¶14] The EMS immunization rule is related to "the safe handling and transportation" of patients, 32 M.R.S. § 81-A; to "the treatment and nontransport under appropriate medical guidance, of the sick and injured," *id*.; and to licensure qualifications for EMS workers, *id.* § 84(1)(G). *See id.*

§ 84(1)(A); *see, e.g., State v. Webber*, 2000 ME 168, ¶¶ 7-9, 759 A.2d 724; *State v. Dube*, 409 A.2d 1102, 1104-05 (Me. 1979).

[¶15]  Although there is no specific delegation of rulemaking authority to promulgate the EMS immunization rule, Calnan's argument is unpersuasive for two reasons.  First, the Legislature's delegation of rulemaking authority to the EMS Board is broad and comprehensive enough to include the EMS Board's regulation of EMS workers in order to protect the health, safety, and welfare of patients.  *See, e.g., Biden v. Missouri*, 595 U.S. ___, 142 S. Ct. 647, 652-55 (2022) (concluding that, in issuing a rule requiring health care workers to be vaccinated against COVID-19, the Secretary of Health and Human Services did not exceed its broad statutory authority to set conditions on health care workers to protect the health and safety of patients); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1287-89 (11th Cir. 2021) (same); *In re City of Newark*, 264 A.3d 318, 325-27 (N.J. Super. Ct. App. Div. 2021) (stating that the Mayor of Newark acted within the Mayor's authority in issuing a COVID-19 vaccination mandate for city employees even though there is no express statutory authority for such a mandate); *cf. Headworks Hand Crafted Ales, Inc. v. Wash. State Liquor & Cannabis Bd.*, 540 P.3d 863, 870-71 (Wash. Ct. App. 2024) (indicating that the Washington State Liquor and Cannabis Board has authority

to enforce a mask mandate through its statutory authority to "prescribe the conditions, accommodations, and qualifications requisite for the obtaining of licenses to sell alcoholic beverages" and to "regulate the sale of those beverages . . . in the interests of public health, safety, and morals" (quotation marks omitted)); *Doane v. Dep't of Health & Hum. Servs.*, 2021 ME 28, ¶ 23, 250 A.3d 1101 ("[B]ecause the subject matter of the regulation at issue here concerns public health and safety, a wide amount of rulemaking latitude may be necessary."). Second, the EMS immunization rule does not conflict with the statutory language. *See Coulombe v. Anthem Blue Cross/Blue Shield of Me., Inc.*, 2002 ME 163, ¶ 17, 809 A.2d 613; *Baker v. S.D. Warren Co.*, 2010 ME 87, ¶ 15, 3 A.3d 380.

[¶16] Although Calnan challenges the EMS Board's overall authority with regard to immunization, when the EMS Board initially promulgated the rule in 2021, public policy supported requirements that certain people, especially healthcare workers such as EMS personnel, be vaccinated. *See In re City of Newark*, 264 A.3d at 327 ("Th[e] right ['to hire or direct its workforce',] coupled with the clear national and state public policy to combat the health threats posed by COVID-19, supports the City's authority to implement a vaccination mandate."); *Boston Firefighters Union, Loc. 718 v. City of Boston*, 205 N.E.3d 282,

294-95 (Mass. 2023) ("[V]accination against COVID-19 not only protected the health of the city residents, but also protected the [City's] ability to continue to maintain a sufficiently healthy workforce during the Omicron surge, as would be needed to deliver emergency public safety services to the residents of the city."). We conclude that the EMS Board did not exceed its statutory authority in issuing the EMS immunization rule.

## B.    Alignment with Statutory Purpose

[¶17]  The question of whether the EMS immunization rule is misaligned with the EMS Act's statutory purpose is an issue of statutory interpretation that we review de novo. *See Bd. Of Osteopathic Licensure*, 2020 ME 134, ¶ 10, 242 A.3d 182.

[¶18]  On appeal, Calnan selectively highlights parts of the EMS Act's statement of purpose to support his contention that the EMS immunization rule is misaligned with it. Contrary to Calnan's winnowed articulation of the reasons for the statute, the EMS Act's statement of purpose is quite sweeping. The statement of purpose reflects that the EMS Act is intended "to promote and provide for a comprehensive and effective emergency medical services system to ensure optimum patient care." 32 M.R.S. § 81-A. "Key elements" of the EMS system include "the provision of prompt, efficient and effective emergency

medical dispatch and emergency medical care, a well-coordinated trauma care system, effective communication between prehospital care providers and hospitals and the safe handling and transportation, and the treatment and nontransport under appropriate medical guidance, of the sick and injured." *Id.* A rule requiring that EMS workers be immunized is aligned with the statute's purpose of achieving "optimum patient care," the "safe handling and transportation" of patients, and "the treatment and nontransport[,] under appropriate medical guidance, of the sick and injured" by ensuring that patients are not exposed to certain communicable diseases. *Id.*

[¶19]  Additionally, there is nothing in the statutory scheme evidencing any contrary purpose regarding the EMS Board's authority with respect to immunizations. *Cf. Ne. Occupational Exch., Inc.*, 540 A.2d at 1116-18 (affirming a challenge to the Community Mental Health Services Act's delegation of discretionary licensing and rulemaking authority to the Commissioner partly due to the Act's purpose to promote and guide mental health programs within Maine).

## C.    Procedural Defect

[¶20]  The question of what kind of rule the EMS Board was required to promulgate is an issue of statutory interpretation that we review de novo. *See*

*Bd. of Osteopathic Licensure*, 2020 ME 134, ¶ 10, 242 A.3d 182. "An agency must comply with the APA before it adopts a rule; otherwise the rule has no legal effect." *Roderick v. State*, 2013 ME 34, ¶ 9, 79 A.3d 368. The Maine APA divides agency rules authorized after January 1, 1996, into two categories: routine technical rules and major substantive rules. *See* 5 M.R.S. § 8071(2) (2024). "Routine technical rules are procedural rules that establish standards of practice or procedure for the conduct of business with or before an agency and any other rules that are not major substantive rules . . . ." *Id.* § 8071(2)(A). Major substantive rules, on the other hand, "[r]equire the exercise of significant agency discretion or interpretation in drafting." *Id.* § 8071(2)(B)(1). Enabling statutes enacted after January 1, 1996, have been required to designate rules that an agency is authorized to adopt as either routine technical rules or major substantive rules. *See id.* § 8071(1).[9] Section 8071 states that "rules adopted pursuant to rule-making authorization delegated [by the Legislature] to an

---

[9] Section 8071(1) provides,

All new rules authorized to be adopted by delegation of legislative authority that is enacted after January 1, 1996, including new rules authorized by amendment of provisions of laws in effect on that date, must be assigned by the Legislature to one of 2 categories and subject to the appropriate level of rule-making procedures as provided in this subchapter. The Legislature shall assign the category and level of review to all rules at the time it enacts the authorizing legislation. The Legislature may assign different categories and levels of review to different types of rules authorized by the same legislation.

16

agency after January 1, 1996[,] are subject to the procedures" particularly required for routine technical rules or major substantive rules, depending on the category to which the Legislature assigns the rules.

[¶21] The rulemaking process for routine technical rules "includes the provision of notice to the public and pertinent legislative committees, 5 M.R.S. §§ 8053, 8053-A [(2024)]; a comment period, *see id.* § 8057-A(3); and an opportunity for aggrieved persons to seek judicial review, *see id.* § 8058."[10] *Wood v. Dep't of Inland Fisheries & Wildlife*, 2023 ME 61, ¶ 26, 302 A.3d 18; 5 M.R.S. § 8071(3)(A). Major substantive rules are subject to more demanding rule-making requirements under 5 M.R.S. § 8072 (2024). The heightened requirements for major substantive rules include a notice and comment period as required for routine technical rules, but that process only results in a provisional adoption of such rules; major substantive rules are then subject to legislative review and authorization before final adoption can occur. *Compare id.* §§ 8071-72 (describing the notice and comment period respect to major

---

[10] "[T]he rulemaking process required by Maine's Administrative Procedure Act enhances accountability and ensures that the resulting regulations appropriately limit the authority of the agency and avoid arbitrary standards." *Wood v. Dep't of Inland Fisheries & Wildlife*, 2023 ME 61, ¶ 26, 302 A.3d 18.

substantive rules), *with* §§ 8053, 8053-A, 8057-A, 8071(2)(A) (describing the notice and comment period respect to routine technical rules).

[¶22]   The EMS Board is authorized to adopt rules "to carry out the purposes, requirements and goals of [the EMS Act]."   32 M.R.S. § 84(1)(A). Section 84(1)(A) was enacted and became effective before January 1, 1996, and it has not been amended since to include a designation of whether the EMS Board's rules are major substantive rules or routine technical rules.  Because the rulemaking authority granted to the EMS Board in section 84(1)(A) was effective before January 1, 1996, the immunization rule, which was adopted under that statutory authority, *see* 16-163 C.M.R. ch. 21 (effective August 7, 2022), is not assigned to either category of rules, *see* 5 M.R.S. § 8071(2) ("There are 2 categories of rules *authorized for adoption after January 1, 1996.*" (emphasis added)).  Therefore, the immunization rules were subject only to the procedural requirements that apply to all rules and not to the additional procedural requirements that apply to major substantive rules.  *See, e.g.*, 5 M.R.S. § 8052 (2024) (enumerating requirements for an agency's adoption of "any rule"); 5 M.R.S. § 8071(3)(B) (making major substantive rules subject to

the additional requirements of 5 M.R.S. § 8072).[11]  Additionally, there is nothing in the complaint or record before the court suggesting that the EMS Board did not comply with its rulemaking obligations pursuant to the Maine APA.[12] *See, e.g.*, 5 M.R.S. §§ 8052, 8053, 8053-A, 8057-A(3) (containing requirements for adoption of any agency rule).

[¶23]  Because the enabling statute gave a broad grant of authority to the EMS Board to promulgate rules related to the EMS program, the EMS immunization rule was consistent with the purposes of the EMS Act, and the EMS Board followed the applicable rule making process for the promulgation of the EMS immunization rule, we affirm the court's judgment.

The entry is:

Judgment affirmed.

---

[11]  Calnan argues that the EMS immunization rule matches the definition of a major substantive rule and is therefore a major substantive rule.  The Legislature, however, has not said that agency rules adopted pursuant to authority granted prior to 1996 are assigned to the category that they would have been assigned to had they been authorized after 1996; rather, rules are major substantive or routine technical rules only when they are designated as such in enabling legislation adopted after January 1, 1996.

[12]  "The possibility of arbitrary administrative decision-making . . . is assuaged by the formal APA rulemaking process."  *Wood*, 2023 ME 61, ¶ 26, 302 A.3d 18 (quotation marks omitted).

Terry Mitrenga, Esq. (orally), Augusta, for appellants Chris Calnan et al.

Aaron M. Frey, Attorney General, Sarah Coleman, Asst. Atty. Gen. (orally), and Samantha Morgan, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellees Sam Hurley and Maine Emergency Medical Services

Kennebec County Superior Court docket number CV-2022-188
FOR CLERK REFERENCE ONLY